## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **OMAR SHARIFF CASH,** | : | **CIVIL ACTION** |
| *Petitioner* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL** *et al.,* | : | **No. 16-3758** |
| *Respondents* | : | |

### MEMORANDUM

PRATTER, J.                                                        MARCH *10*, 2021

Omar Shariff Cash is serving a life sentence for the kidnapping of Edgar Perez Rosas-Gutierrez and MCDA,[1] the murder of Mr. Rosas-Gutierrez, and the repeated rape of MCDA. Mr. Cash petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Magistrate Judge Jacob P. Hart issued a Report and Recommendation recommending that Mr. Cash's Petition be denied. (Doc. No. 59.) For the reasons that follow, the Report and Recommendation is adopted in full.

### BACKGROUND

#### I.    Factual Background

At trial, the following evidence was introduced, as summarized by the Bucks County Court of Common Pleas:

> On May 10, 2010, shortly before midnight, victims Edgar Perez Rosas-Gutierrez and MCDA proceeded to Jalapeño Joe's nightclub in a black Buick sedan belonging to Mr. Gutierrez' uncle, Renee Gutierrez. Mr. Rosas-Gutierrez parked the vehicle in an adjoining parking lot some distance from the club. The two victims entered Jalapeño Joe's and spent several hours inside dancing and socializing with various members of Mr. Rosas-Gutierrez's family. At approximately 3:30 a.m., when the club was almost empty, the victims left. They walked alone to the dimly lit area where their car was parked. When they arrived at the car, Mr. Rosas- Gutierrez hugged and kissed MCDA and then opened the passenger side door for her. She got inside and lit a cigarette. Mr. Rosas-Gutierrez

---

[1]    MCDA's true name has been redacted out of a concern for her privacy.

then walked around the back of the car and got into the driver's seat. Thereupon, [Mr. Cash], who had been loitering in the area of the parking lot . . . entered the victims' vehicle by way of the back door on the driver's side. He pulled out a handgun, pointed it at the head of Mr. Rosas-Gutierrez and began shouting.

MCDA, who speaks Portuguese and is not fluent in English, could not understand what [Mr. Cash] was saying. Mr. Rosas-Gutierrez, however, had some knowledge of English, and was able to converse with [Mr. Cash]. Apparently at [Mr. Cash's] direction, Mr. Rosas-Gutierrez turned on the ignition and quickly drove away from Jalapeño Joe's northbound on Castor Avenue. In an "ugly" and menacing tone of voice, [Mr. Cash] told the victims to take him to a hotel, alternately pointing his handgun at their heads. At gunpoint, [Mr. Cash] robbed Mr. Rosas-Gutierrez of his identification papers, and MCDA of $400.00 in cash from her purse. Thereafter, [Mr. Cash] and his hostages proceeded northbound in the vehicle on Roosevelt Boulevard. At that time, using Mr. Rosas-Gutierrez as his interpreter, [Mr. Cash] directed that MCDA climb into the back seat with him. She complied and [MCDA] proceeded to remove her clothes and rape her at gunpoint while the car was in motion. . . . In between his threats and criminal acts, [Mr. Cash] laughed. After the rape, [Mr. Cash] pushed MCDA aside on the back seat and told her to put her clothes back on. He continued to demand that the victims take him to a hotel. Eventually, they pulled into the Sunrise Inn located on Route One in Bensalem Township, Bucks County, and parked the vehicle along side of the building. While parked, [Mr. Cash] demanded Mr. Rosas-Gutierrez's wallet at gunpoint. When it was handed over, [Mr. Cash] removed the cash and threw the wallet at Mr. Rosas-Gutierrez. In the meantime, MCDA had put her clothes back on while the car was parked. [Mr. Cash] then directed that she return to the front passenger seat. At gunpoint, he told Mr. Rosas-Gutierrez to drive away from the premises. . . . At trial, the jury was shown a surveillance video depicting the victim's car at the Sunrise Inn parking lot.

Upon leaving the Sunrise Inn, [Mr. Cash] and his victims proceeded onto the exit ramp from northbound Roosevelt Boulevard leading to eastbound Street Road in Bucks County. The exit ramp was poorly lighted and surrounded by woods on both sides. At gunpoint, [Mr. Cash] directed Mr. Rosas-Gutierrez to pull over and stop the car. [Mr. Cash] got out of the back seat of the car and approached the driver's door. He pointed his handgun at Mr. Rosas-Gutierrez, grabbed him around the neck and removed him from the car. [Mr. Cash] walked Mr. Rosas-Gutierrez up an embankment [alongside] of the roadway at gunpoint. Near the top of the embankment he shot Mr. Rosas-Gutierrez point blank in the back of the head, severing his brain stem and killing him instantly. MCDA heard the gun shot and then observed [Mr. Cash] quickly return to the vehicle. As she was calling out for "Edgar", [Mr. Cash] got into the driver's seat and fastened her seatbelt while holding the gun. [Mr. Cash] was laughing as he pulled away from the scene, leaving tire marks on the shoulder of the road as he quickly accelerated. A night clerk at the Sunrise Inn heard the gunshot at approximately 4:30 a.m. on May 11, 2008.

[Mr. Cash] and MCDA next stopped at a "7-Eleven" convenience store located a short distance from the murder scene, where he purchased a beverage. They then left and [Mr. Cash], acting happy, was singing and moving to the music playing on the car radio as he drove. Shortly thereafter, [Mr. Cash] pulled into a parking lot near a large building with

an expansive lawn, most likely Philadelphia Park on Street Road in Bensalem Township. He got out of the car, grabbed MCDA by her hair and pulled her out of the vehicle. At gunpoint, he forced her to take off her pants and pushed her onto the hood of the car. Thereupon he held her down and []raped her. [Mr. Cash] kept the gun in his hand during the sexual assault. After the rape, MCDA put on her clothes and she was led by [Mr. Cash] toward a small lake. Fearing for her life, she ran away toward[s a] building and tried to get inside, but was not able to gain entry or make contact with anyone. [Mr. Cash] came after her, took hold of her arm and pulled her back to the car. He put her in the front passenger seat, fastened her seatbelt, and drove off in the direction of central New Jersey. [Mr. Cash] drove with his left hand and kept the gun in his right hand aimed at MCDA. As he was driving, [Mr. Cash] appeared happy and began singing the tune "New York, New York". He laughed as he commented on how beautiful it is there. [Mr. Cash] proceeded toward New York and made his next stop at a Comfort Inn on U.S. Route One in Lawrence Township, New Jersey.   He and MCDA arrived there at approximately 5:30 a.m., whereupon he removed her from the car by taking her arm. They then entered the lobby and [Mr. Cash] directed her to sit in a waiting area while he approached the check-in counter. Using identification that belonged to an individual by the name of "Elbert Small" from the state of Delaware, [Mr. Cash] booked room number 410. While he was checking in, MCDA attempted to draw the attention of the clerk by gesturing that [Mr. Cash] had a gun, but the clerk did not respond.

After checking in, [Mr. Cash] took MCDA by the arm and escorted her to the hotel elevator. They proceeded to the fourth floor and entered room 410.   Once inside, [Mr. Cash again raped MCDA] . . . .   After[wards, Mr. Cash] impatiently told MCDA to get dressed.   She did so and they went down to the lobby, whereupon MCDA ran from [Mr. Cash] out the front door. He followed and grabbed her shoulders with both arms and ripped off her purse. MCDA then ran back inside screaming for help, jumped over the four-foot check-in counter and hid behind the clerk. After the clerk realized that she was in great distress, he telephoned the police.   By the time police responded, [Mr. Cash] had fled the scene. MCDA was taken by New Jersey authorities for a sexual assault examination.   A video surveillance tape showing the common areas of the Comfort Inn was viewed by the jury at trial.   The video depicted the victim running from the lobby followed by [Mr. Cash], and then running back into the lobby and climbing over the front desk to escape [Mr. Cash]. The video showed the [Mr. Cash] wearing the same tan slacks and shirt and black baseball cap that he was observed in earlier that morning.

(Doc. No. 7-2 at 45-47; Doc. No. 7-3 at 4-5.)

Mr. Cash then drove to New York City, where he was arrested for possession of marijuana on March 11, 2007. (Doc. No. 7-3 at 5.) After giving the police a false name and address, Mr. Cash was released pending a court appearance. *Id.* at 6. The next day, Mr. Cash stole a vehicle. *Id.* On March 13, 2008, police noticed the stolen SUV double parked at a bus stop on Broadway and 136th

Street in Manhattan. *Id.* The officers stopped the vehicle after Mr. Cash attempted to move it. *Id.* Mr. Cash became aggressive and combative, and was arrested. *Id.*

While Mr. Cash was in custody, Bucks County Detective Daniel Nieves traveled to New York to meet with him. *Id.* at 8. After the detective read to Mr. Cash his *Miranda* rights, Mr. Cash told Detective Nieves: "I don't want to talk about no murder." (Doc. No. 59 at 3.) However, Mr. Cash did observe that law enforcement from Bucks County probably had a better case against him than those from Philadelphia. (Doc. No. 7-3 at 8.)

Mr. Cash subsequently was extradited to Pennsylvania. Mr. Cash testified at trial that on August 4, 2008, Philadelphia County police detectives attempted to question him, but he told them that he would not speak without an attorney present. *Id.* But, nevertheless, he did later speak to Detective Nieves. *Id.* According to Detective Nieves, Mr. Cash refused to discuss certain topics, but did not attempt to end the conversation or invoke his right to counsel. *Id.* During this conversation, he stated that the entire case against him rested on the "Spanish girl."

**II.    Mr. Cash's Trial**

**A. Pre-trial Motions**

Mr. Cash filed several pre-trial motions. The first relevant motion sought to suppress statements he had made to law enforcement on May 14, 2008 and August 4, 2008. (*See* Doc. No. 59 at 4.) The trial court denied the motion, holding that Mr. Cash had ignored his counsel's recommendation to remain silent, and had spoken voluntarily. *Id.* Alternately, the court held that admission of the statements constituted harmless error. *Id.*

Second, the trial court granted Mr. Cash's request to represent himself at trial with standby counsel. *Id.* Approximately two months later, stand-by-counsel informed the court that Mr. Cash no longer wished to proceed pro se. *Id.* After Mr. Cash was questioned by the judge, stand-by

4

counsel, and the prosecutor, the judge allowed counsel to represent Mr. Cash. *Id.* Mr. Cash was also assigned a second attorney. *Id.*

The third set of motions all related to information about MCDA's immigration status. At hearings conducted on August 13 and November 4, 2009, defense counsel argued that if the Commonwealth was assisting MCDA with her immigration status, evidence of that assistance might be exculpatory. *Id.* at 5. The prosecutor responded that he did not have information about MCDA's status, but believed that she was in the country legally. *Id.* The Commonwealth did not produce any information about MCDA's immigration status, and Mr. Cash filed a motion to compel discovery on April 30, 2010. *Id.* On the day before jury selection, the court considered his motion to compel. *Id.* During that hearing, Detective Nieves testified that he had signed a form supporting MCDA's application for a U Visa. *Id.* He testified that the purpose of the form was "to keep [MCDA] in the country legally," and that the visa sought "information from any prosecution or police investigation as to her cooperation as a victim, witness, in any prosecution." *Id.* at 6. When he was asked about the nature of the form he signed, he answered: "I believe it's a U Visa. I don't know the exact name." *Id.* Detective Nieves further testified that he knew MCDA was not a United States citizen but was unsure whether she was in the country legally, and that he sent the form back to MCDA's immigration attorney without retaining a copy. *Id.*

### B. Trial

At trial, both parties discussed MCDA's immigration status at length. Defense counsel's opening statement suggested that MCDA was testifying dishonestly in order to obtain a visa, and that Detective Nieves' choice to sign the form was evidence of "police bias." *Id.* at 6. MCDA testified on direct examination that at the time of the crime she was in the country illegally, but that in April 2010 she had received "a card saying that I can work here." *Id.* The prosecutor asked: "And did you receive any help, any assistance from Detective Nieves in terms of obtaining that

5

green card or that working permit?" *Id.* at 6-7. She replied "yes." *Id.* at 7. The prosecutor then asked: "Do you know if he filled out a paper?" *Id.* Again, she replied "yes." *Id.* However, MCDA also testified that she did not alter her testimony to increase her chances of receiving "a working permit." *Id.*

Detective Nieves also testified that he had completed "what's referred to as a U-visa application" on behalf of MCDA. *Id.* He also described the form he filled out in some detail. *Id.* at 7-8. He also testified that this was the fourth or fifth such form that he had filled out for various witnesses, and that he usually asked a supervisor for permission before filling one out. *Id.* at 8. He stated that doing so was "no problem, I've done it in the past without even thinking about it." *Id.* He testified that he had not prepared a report about filling out the form at the time, and only did so during trial after Mr. Cash's attorney asked about the form. *Id.*

Mr. Cash's counsel's closing argument attempted to impeach MCDA's credibility by pointing to the assistance she had received from the Commonwealth. *Id.* He noted that MCDA could no longer be deported, and that information about MCDA's immigration status came up only shortly before trial. He also attempted to impeach Detective Nieves' testimony by pointing out that he said that he writes reports about "everything that's important," but had failed to make a report about signing the U visa certification until during trial. *Id.* at 8-9.

### C. Conviction and Sentencing

After a seven-day jury trial, Mr. Cash was convicted of a variety of counts, including first-degree murder, two counts of rape, and kidnapping. *Id.* at 9. The jury did not come to a unanimous decision on the death sentence, so the trial judge sentenced Mr. Cash to life imprisonment without the possibility of parole. *Id.*

## III.   Mr. Cash's Post-trial Filings

### A. Direct Appeal

Mr. Cash filed a variety of post-trial motions which were denied, and Mr. Cash filed a direct appeal. *See id.* at 10. In his appeal, he made three arguments: (1) the trial court erred in failing to suppress statements he made to the Bensalem Police on August 4, 2007; (2) the trial court abused its discretion by admitting into evidence two statements he made to Bensalem Police on May 14, 2008, which alerted the jury to the fact that Mr. Cash was accused of other crimes; and (3) that the trial court erred in prohibiting Mr. Cash from introducing evidence that MCDA worked as a prostitute, and that Mr. Rosas-Gutierrez drove her to assignments. (Doc. No. 7-3 at 36-60; Doc. No. 7-4 at 4-23.)

The Superior Court denied Mr. Cash's appeal, adopting the trial court's opinion as its own. (Doc. No. 7-4 at 71.) The Pennsylvania Supreme Court denied his petition for allowance of appeal. (Doc. No. 7-5 7.)

### B. First PCRA Petition

On August 12, 2012, Mr. Cash filed his first petition under Pennsylvania's Post-Conviction Relief Act ("PCRA"). After a protracted set of proceedings, the PCRA court denied Mr. Cash's petition. (Doc. No. 7-9 at 34-58.) Mr. Cash then appealed. In his appeal, Mr. Cash argued that that trial counsel was ineffective by (1) coercing or inducing him to waive his right to self-representation, and (2) by failing to argue a *Brady* claim at trial and on direct appeal regarding MCDA's immigration status. The Superior Court affirmed the PCRA court's decision. (Doc. No. 7-11 at 4-16.) Mr. Cash petitioned the Pennsylvania Supreme Court for allowance of appeal, and his petition was denied. (*See* Doc. No. 7-11 at 20.)

7

## C. Habeas Petition

On July 11, 2016, Mr. Cash filed a petition for a writ of habeas corpus. In this petition, he argued that (1) his trial counsel denied his right to self-representation, and (2) the Commonwealth violated his *Brady* rights by withholding and misrepresenting information about MCDA's immigration status. On his second claim, Mr. Cash argued that this obfuscation was accomplished by concealing information about the form completed by Detective Nieves, failing to retain and disclose a copy of the form Detective Nieves signed, and by eliciting false testimony about the U visa from MCDA. (*See* Doc. No. 1-2 at 5-31; Doc. No. 1-3 at 1-25.)

On August 30, 2016, the Court appointed the Federal Defender's Office to represent Mr. Cash. On December 22, 2016, Mr. Cash filed a motion for discovery. (Doc. No. 11.) In it, Mr. Cash sought MCDA's "Alien File" or "A File" from the Department of Homeland Security. He argued that this information may show that the Commonwealth "downplayed and obfuscated the nature of the assistance it provided to MCDA in exchange for her cooperation." (Doc. No. 11-1 at 8.) He also argued that MCDA may have lied in her visa application about whether she had engaged in prostitution, "creating a strong motive for her to lie about whether her sexual encounter was an act of consensual prostitution, as he maintained." *Id.* Magistrate Judge Hart granted Mr. Cash's motion to seek discovery. (Doc. No. 17.)

In a letter memorandum dated February 22, 2017, the DHS refused to provide or confirm the existence of MCDA's A File. (Doc. No. 20-2 at 3.) Mr. Cash then filed a motion to compel production of the documents. (Doc. No. 20.) Magistrate Judge Hart filed a report and recommendation, which recommended that the motion be denied. (Doc. No. 30.)

Before this Court had ruled on Mr. Cash's motion to compel, Mr. Cash sought and obtained this Court's permission to file a First Amended Petition for Writ of Habeas Corpus. In this petition, Mr. Cash added a claim that his Fifth Amendment rights were violated when the trial court

8

introduced evidence of statements he made to the police after he invoked his right to an attorney, and his right to remain silent. (Doc. No. 35 at 1-4.) He also added a claim of cumulative error. *Id.* at 4-5.

Mr. Cash also filed a motion to stay, pending resolution of his second PCRA petition, which had been filed on June 12, 2017. *Id.* at 13. Magistrate Judge Hart granted that motion. (Doc. No. 40.)

### D. Second PCRA Petition

Mr. Cash filed a second PCRA petition in the Bucks County Court of Common Pleas. (Doc. No. 36.) In this petition, Mr. Cash argued that untimeliness should be forgiven because the Commonwealth had interfered with his ability to obtain evidence about MCDA's immigration status, and that he had newly discovered evidence in the form of "the possible non-existence of MCDA's U-visa." (Doc. No. 55-2 at 6-7.) He largely repeated issues already litigated in his first PCRA petition, but also added two claims: (1) a *Brady* violation premised on the DHS's memorandum, and (2) denial of the right to self-representation. In this second claim, Mr. Cash argued that Detective Neives's failure to retain a copy of the U visa certification he signed violated Mr. Cash's right to self-representation, because he would not have allowed counsel to represent him if he had known that counsel would be unable to obtain MCDA's A file. *Id.* at 28-9.

On December 4, 2017, the PCRA court denied his PCRA petition as time-barred. It also held that Mr. Cash's claims were without merit. (Doc. No. 55-5 at 47-76.) Mr. Cash appealed that denial to the Pennsylvania Superior Court. The Superior Court affirmed the PCRA court. (Doc. No. 55-6 at 68-71.) Mr. Cash did not appeal that decision to the Pennsylvania Supreme Court.

### E. Second Amended Habeas Petition

Mr. Cash then filed a motion to remove this case from suspense. (Doc. No. 44.) The Court granted his motion. (Doc. No. 47.) Mr. Cash then filed for leave to file a second amended habeas

9

petition. (Doc. No. 50.) The Court granted that motion as well. (Doc. No. 52.) Mr. Cash's second amended habeas petition realleges all claims for relief contained in his original and first amended petition, but also adds to his *Brady* claim by arguing that: (1) the Commonwealth permitted MCDA and Detective Nieves to testify falsely by describing the U visa as a "work permit;" (2) Detective Nieves was not permitted to sign the U visa certification; (3) the "Commonwealth assist[ed] MCDA in her circumvention of the U-Visa process by precluding disclosure of her history of prostitution, which she had admitted to [Detective] Nieves"; and (4) that even if the Commonwealth did not knowingly withhold the U visa certification, it constructively possessed the form such that failure to produce it violated *Brady*. (Doc. No. 54 at 14.) Mr. Cash also added a due process claim, arguing that the Commonwealth "knowingly and intentionally subverted the court process" and "maliciously abused the federal U-visa process." *Id.* at 26-34. Next, Mr. Cash added an argument that he was deprived of the right to counsel as well as his right to self-representation. *Id.* at 34-36. Finally, Mr. Cash added a cumulative error claim. *Id.* at 36.

### LEGAL STANDARD

Federal courts can only grant a writ of habeas corpus if a claim "was 'adjudicated on the merits' in state court." *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 281 (3d Cir. 2018) (citing 28 U.S.C. § 2254(d)). And if the claim was adjudicated on the merits in state court, habeas relief can only issue if adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2).

"If a claim was not adjudicated on the merits in state court, [the court] review[s] legal questions and mixed questions of law and fact *de novo.*" *Id.* (citing *Cone v. Bell*, 556 U.S. 449, 472 (2009)). In that case, the state court's factual determinations are presumed to be correct which may be rebutted by clear and convincing evidence. *Id.* at 282 (citing *Appel v. Horn*, 250 F.3d 203, 210 (2001)).

"As a general rule, federal courts may exercise the power to consider habeas applications only where 'it appears that the applicant has exhausted the remedies available in the courts of the State.'" *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999) (quoting *Walker v. Vaughn,* 53 F.3d 609, 614 (3d Cir.1995)). This "exhaustion rule" requires a petitioner to "fairly present" federal claims in state court before bringing them in federal court. *Id.* (citing *Duncan v. Henry,* 513 U.S. 364, 365 (1995); *Picard v. Connor,* 404 U.S. 270, 275 (1971); *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997)). "When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *Id.* (citing 28 U.S.C. § 2254(b)). In that case, a petitioner has procedurally defaulted his or her claims and the federal court may not consider the merits of the claim unless the petitioner "establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default." *Id.* (citing *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)).

## DISCUSSION

**IV.    Brady Claim**

Mr. Cash's *Brady* claim can be distilled into three parts: (1) the Commonwealth failed to produce the U-Visa Certification that Detective Nieves signed; (2) the Commonwealth concealed

11

information about MCDA's immigration status; and (3) failing to disclose the possibility that the DHS/USCIS did not possess MCDA's A file.

There is a preliminary problem with Mr. Cash's *Brady* claims. He never presented a direct *Brady* claim below. Rather, he only argued that his trial counsel was ineffective for failing to raise a *Brady* claim during his direct appeal. (*See* Doc. No. 7-11 at 14-16.) However, as Magistrate Judge Hart noted, the Pennsylvania Superior Court nevertheless analyzed his *Brady* claim in detail, which some courts have held exhausts the direct claim. *See Gee v. Kerestes*, 722 F. Supp. 2d 617, 623-24 (E.D. Pa. 2010); *Veal v. Myers*, 326 F. Supp. 2d 612, (E.D. Pa. 2004). Thus, the Court will assume, as did Magistrate Judge Hart, that the *Brady* claims were exhausted.[2]

### A. Failure to Produce the U-Visa Certification

Mr. Cash argues that he did not learn that Detective Nieves had improperly signed MCDA's U-Visa Certification until after he filed his Second PCRA petition. (*See* Doc. No. 54 at 11.) In a pretrial proceeding, Detective Nieves testified that he had not been designated by the Bensalem Police Department to fill out U-Visa certifications. *See id.* Mr. Cash argues that the Commonwealth should have produced this U-Visa certification, and failure to do so constitutes a *Brady* violation.

The first problem with this argument is that it is untimely. On May 3, 2010—before trial had begun—Detective Nieves testified that he had signed a form to support MCDA's application for a visa that he believed was called a U-Visa. Mr. Cash and his attorneys could have investigated the nature of this certification, found the publicly available Schedule B form, and seen the language in the signature section which required the signer be the head of the agency, or be specifically

---

[2]     As noted below, there is an additional exhaustion problem with Mr. Cash's *Brady* claim premised on Detective Nieves's allegedly improper certification of MCDA's U visa. The Court does not assume that this claim was exhausted.

designated to issue U visa certifications.   And this possibility is not a mere hypothetical. Mr. Cash's attorney testified at trial that he did, in fact, obtain the relevant form before trial. Thus, any time after May 3, 2010, all of the information Mr. Cash alleges was withheld was available to him.  His failure to raise the argument until his Second Amended Habeas Petition renders this argument untimely.

This argument is also procedurally defaulted.  Before a writ of habeas corpus can be granted, a petitioner must present the claim to the state courts. *See* 28 U.S.C. § 2254; *Landano v. Rafferty*, 897 F.2d 661, 669 (3d Cir. 1990).  In doing so, it is not sufficient for the petitioner to merely attempt to argue the issue to the state court; the petitioner must also comply with state procedural rules. *See Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)) ("[W]e ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts. . . ."). This claim is procedurally defaulted because none of Mr. Cash's PCRA petitions included the allegation that Detective Nieves improperly signed the U visa certification. *See Commonwealth v. Rigg*, 84 A.3d 1080, 1084 (Pa. 2014) (claims not included in the PCRA petition are waived).

To excuse procedural default, a petitioner must show cause, or "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Bentley v. Harlow*, No. CV 11-2423, 2015 WL 10487721, at *6 (E.D. Pa. Oct. 20, 2015) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Mr. Cash argues that there is cause for his procedural default because he did not learn that the Commonwealth "knew of, but kept back" this exculpatory evidence until after he had filed his second PCRA petition.  (Doc. No. 58 at 13-15.) Even crediting Mr. Cash's characterization of events (which this Court is not yet aware would be

even remotely appropriate), this did not prevent him from complying with the Commonwealth's procedural rule by amending his petition: indeed, Mr. Cash had previously, successfully amended his first PCRA petition. (*See* Doc. No. 7-7 at 16-53, Doc. No. 7-8 at 4-34.)

Even if this argument was not untimely and procedurally defaulted, it is without merit. The Superior Court's finding was not "contrary to, or involved an unreasonable application of, clearly established Federal law," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Mr. Cash admits that the Commonwealth did not have a copy of the U visa certification, but argues that they were obligated to disclose it because they had constructive possession of the form. But the Commonwealth did not constructively possess the U visa certification. "[T]he Third Circuit has 'held that "possession" in the *Brady* context extends to material not within the prosecutor's actual knowledge or possession, provided that the evidence is either (a) known to some other "arm of the state," or (b) "known to others acting on the government's behalf in the case."'" *United States v. Munchak*, No. 3:CR-10-75, 2014 WL 3557176, at *14 (M.D. Pa. July 17, 2014), *aff'd,* 648 F. App'x 195 (3d Cir. 2016) (quoting *Strohl v. Grace*, 354 F. App'x 650, 654 (3d Cir. 2009)). Said another way, "the entity charged with constructive possession [must have] 'ready access' to the evidence." *Id.* (quoting *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006)). Here, there not such a close relationship between the Department of Homeland Security and the Bensalem Police Department/Detective Nieves to give the police "ready access" to the signed U visa certification. To the contrary, the relationship between Detective Nieves and DHS could hardly be more tenuous. The record shows that Detective Nieves never interacted with DHS, but rather received a form from MCDA's immigration lawyer, signed it, and mailed it on to the proper destination. Because the

Commonwealth did not actually or constructively possess the U visa certification, there can be no *Brady* violation.

Finally, even if the Commonwealth could be said to have possession of the form, Mr. Cash was not prejudiced. Mr. Cash argues that this evidence "questions the integrity, credibility, and objectivity of the entire investigation of this case." *Id.* He even argues that this improper certification was evidence of a conspiracy by Detective Nieves and the Bensalem Police Department to conceal MCDA's history of prosecution from the Federal Government in exchange for her cooperation in testifying at trial, and criticizes the Bensalem Police Department for not arresting MCDA when they learned that she had engaged in prostitution. (*See id.* at 19 ("Nieves and MCDA were in a position in which they must safeguard each other's illegal actions.); *id.* at 31 ("The fact that Detective Nieves [improperly] signed the Supplement B form . . . suggests a level of *quid pro quo* between Nieves and MCDA, first and foremost."); Doc. No. 65 at 18 ("The Commonwealth knew that MCDA had been involved in prostitution . . . . But she was never charged with any crime.")); Doc. No. 58 at 14 ("Detective Nieves permanently suppressed the improperly endorsed U visa Certification, I-918 Supplement B, maliciously abusing the Federal U-Nonimmigrant process in exchange for evidence (MCDA's testimony) . . . .").

But in order for the "suppressed" evidence to be material, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Isaac*, 22 F. Supp. 3d 426, 433 (E.D. Pa. 2014), *aff'd*, 627 F. App'x 160 (3d Cir. 2015) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). And a "[r]easonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

The Commonwealth's failure to produce information about the U visa certification does not undermine confidence in the outcome of Mr. Cash's trial for two reasons. First, Mr. Cash already possessed equivalent information to what was in the signed form; receiving the signed form would not have told him anything new. Mr. Cash's attorneys already knew the name of the visa MCDA possessed (a "U visa"), had enough information from Detective Nieves's testimony to ascertain what form he had signed, and knew that Detective Nieves had signed it. Indeed, Mr. Cash's attorneys did in fact find copies of the exact form in question. Thus, Mr. Cash's argument that he did not and could not have found out what kind of visa MCDA received, or the level of cooperation required of her to receive the U visa certification, is without factual basis.[3]

Second, Mr. Cash's argument is simply too farfetched to even begin to undermine confidence in the outcome of Mr. Cash's trial. He argues that the improperly signed form is evidence of a conspiracy between MCDA and Detective Nieves to frame Mr. Cash. These claims are not only fantastical, but also contrary to the unrebutted evidence that Detective Nieves had not intentionally evaded the directions on the form. Detective Nieves's supervisors had allowed him

---

[3]      For these reasons, the case cited in Mr. Cash's notice of supplemental authority is inapposite. *See Commonwealth v. Bagnall*, 235 A.3d 1075 (Pa. 2020). In *Bagnall*, the only witness to the shooting "explicitly denied the existence of any agreement with the prosecution." *Id.* at 1087. The "defense counsel, in attacking [the witness's] credibility, [was forced to] stat[e] that his motive for lying [was] unknown." *Id.* The Attorney General's Office also took no steps to learn of the agreement from the DA's Office (who had negotiated the agreement with the witness). Here, while the prosecution at first did not know about the U visa, the information was later disclosed through Detective Nieves' testimony.    And defense counsel was not forced to speculate about MCDA's testimony, but argued at length that her U visa application gave her a motive to lie, so this alleged bias was put before the jury to consider in its deliberations. Finally, in *Bagnall*, the information was constructively possessed because the Attorney General's Office and the DA were a part of the same government organization, whereas here the signed form was only possessed by the federal government.

to sign such forms in the past, which as Magistrate Judge Hart noted, "at worst shows that the Bensalem Police Department took a haphazard approach to the Schedule B directions." (Doc. No. 59 at 23.)[4] The Court notes, however, that it is making no such observation as to the Department.

### B. Concealment MCDA's immigration status

Mr. Cash next argues that the Commonwealth concealed information about MCDA's immigration status. Mr. Cash faults MCDA's testimony at trial that she had received a "work visa." At trial, she stated that she had received "a card saying she can work here." (Doc. No. 59 at 22.) Mr. Cash argued that, as a result of this testimony, he did not realize that MCDA had to cooperate with the Commonwealth to obtain her visa until her immigration lawyer so testified during a hearing for Mr. Cash's first PCRA petition. *Id.*

But as Magistrate Judge Hart noted, Mr. Cash knew what visa MCDA had received, and that it required her cooperation with the investigation. Detective Nieves testified in a pretrial hearing that the form he signed was "to keep [MCDA] in the country legally," that the visa was premised on "her cooperation as a victim, witness, in any prosecution," and that he "believe[d] it's a U Visa." Indeed, Mr. Cash's attorney argued to the jury that MCDA was biased because "by being a witness [MCDA] has actually gotten a visa." Thus, there is no *Brady* violation because Mr. Cash possessed the very information he alleges the Commonwealth "concealed," and any violation did not prejudice him because he made the very argument he argues he should have been able to make.

---

[4]     In his objections to the Report and Recommendation, Mr. Cash also argues that Magistrate Judge Hart erred in claiming that Mr. Cash's petition alleged that the Commonwealth "concealed the *existence* of any form," because his argument was actually about concealment of "the *identity* of this form." (Doc. No. 65 at 10-11.) This argument takes a single sentence out of context. Magistrate Judge Hart's Report and Recommendation properly considered and rejected Mr. Cash's argument that he was unable to discover the identity of the form that Detective Nieves signed, as discussed above.

### C. The Possibility That MCDA's Alien File Does Not Exist

Finally, Mr. Cash argues that the DHS's memorandum—in which the DHS refused to produce or acknowledge the existence of MCDA's Alien File—"introduced the possibility that MCDA's Alien File may not exist." (Doc. No. 54 at 10.)

To begin with, it is not at all clear how this evidence is exculpatory. As Magistrate Judge Hart noted, "[Mr.] Cash has not explained . . . what possible motive MCDA, the prosecution, police, and MCDA's immigration attorney would have to fabricate a U-visa story." (Doc. No. 59 at 23.) Indeed, Mr. Cash seized on the existence of a U visa to argue at trial that MCDA had a motive to lie about Mr. Cash's actions—it is implausible that these parties would conspire to lie in a way that would help Mr. Cash's case.

Moreover, as Magistrate Judge Hart also noted, Mr. Cash's argument is "based on a fallacy." The DHS's Memorandum "did not 'introduce' any 'possibility.' It simply told [Mr.] Cash nothing." *Id.* at 22-23. In his objections to Magistrate Judge Hart's Report and Recommendation, Mr. Cash does not respond to these defects in his argument. Accordingly, there is no *Brady* violation, and Mr. Cash was not prejudiced by not possessing this "information" at trial.

### V. Subversion of the Court Process

Mr. Cash also makes a due process claim supported by the same allegations that underly his *Brady* claim. As Magistrate Judge Hart notes, these claims were not raised in either of his PCRA petitions, and are therefore unexhausted and procedurally defaulted. They also fail for the same reasons as discussed above in relation to Mr. Cash's *Brady* claims. Mr. Cash does not list any objections to this portion of Magistrate Judge Hart's opinion. Thus, this claim also fails.

## VI. Denial of the Right to Counsel

Mr. Cash argues that he was deprived of the right to self-representation, or in the alternate, the right to counsel, in three ways.

First, Mr. Cash argues that his November 4, 2009 decision to proceed pro se was unknowing and invalid because at the time he decided to proceed *pro se* he did not know that the Commonwealth had committed *Brady* violations. Magistrate Judge Hart ably discussed the numerous deficiencies in this argument. First, it was never presented in Mr. Cash's two PCRA petitions, and is therefore unexhausted and procedurally defaulted. (*See* Doc. No. 59 at 29.) "It is also incoherent, because Cash does not explain how knowing any of the facts surrounding the *Brady* claim would have affected his request to appear pro se." *Id.* Mr. Cash's objections to the Report and Recommendation do not respond to these points.

Second, Mr. Cash argues his later decision to forego the right to represent himself was not knowing, intelligent, and voluntary. After deciding to represent himself, stand-by counsel visited Mr. Cash to try and convince him to let counsel represent him at trial. Mr. Cash alleges that during this conversation, counsel claimed he would be able to obtain information about MCDA's immigration status. Mr. Cash argues that had he known that counsel would be unable "to obtain any documents regarding MCDA, including but not limited to the improperly endorsed Supplement B form," he would not have waived his right to proceed pro se. (Doc. No. 54 at 36.)

As Magistrate Judge Hart noted, this argument was raised for the first time in Mr. Cash's second PCRA petition, and is therefore procedurally defaulted. Moreover, Mr. Cash was subjected to a thorough colloquy when he waived his right to appear pro se, and never conditioned his waiver on the production of immigration evidence, or even mention immigration evidence at the hearing at all. (*See* Doc. No. 59 at 29-30.)

19

Mr. Cash's third argument is that he was denied the right to represent himself because he

believed that his two lawyers would represent him during both the guilt and penalty phases of trial,

but the lawyers' focus was only on the penalty phase, (*see* Doc. No. 1-2 at 12-13), which left

Mr. Cash effectively "abandoned at the guilt phase of [] trial, in terms of trial preparation and

presentation," (Doc. No. 59 at 25.) Mr. Cash bases this argument on one ambiguous portion of the

testimony of Charles Jonas from Mr. Cash's first PCRA hearing:

> Attorney: And if you could, when you went to those meetings to see him in Philadelphia, is it fair to say you went over strategy for the case and discovery that you had and other issues associated with the guilt phase of the case?
>
> Mr. Jonas: Yes.
>
> Attorney: And is it fair to say that your focus primarily almost up until right before trial in speaking with the defendant had been the guilt phase of the case and how he wanted to pursue his claim of innocence?
>
> Mr. Jonas: Yes. He knew that we were working for the penalty phase, but his focus with us was mostly on the initial guilt phase.

(Doc. No. 1-2 at 13.) Mr. Cash argues that part of the last sentence—"we were working for the

penalty phase"—shows that counsel never prepared a defense for the guilt phase, and that counsel

was therefore unprepared for the guilt phase and "abandoned" Mr. Cash.

As Magistrate Judge Hart noted, there are two problems with this argument. The first is

that it takes the sentence out of context. Read in context, counsel was saying that he and his co-

counsel talked with Mr. Cash about both the guilt and penalty phases of trial. The second problem

with this argument is that it is completely without any evidence that counsel was unprepared for

the guilt phase of trial. Mr. Cash never objected to the quality of his representation during the guilt

phase at any point, much less at trial. As the Pennsylvania Superior Court wrote about this

argument, "[Mr. Cash's] did not seek to reassert his right to self-representation or express

dissatisfaction with the conduct of counsel at trial. [Mr. Cash's] attempt to recast his

20

disappointment with the outcome of the trial into one concerning the voluntariness of his decision to accept counsel is unavailing." *Commonwealth v. Cash*, No. 478 EDA 2015, 2015 WL 9584932, at *4 (Pa. Super. Ct. Dec. 28, 2015). Because there is no evidence that Mr. Cash's waiver of the right to represent himself was involuntary, or that Mr. Cash was "abandoned" by his counsel during the guilt phase of trial, the Superior Court's decision was not inconsistent with federal law.

## VII.    Introduction of Mr. Cash's Statements to Bensalem Police

Mr. Cash argued in his First Amended Complaint that introduction at trial of certain statements that he made on August 4, 2008 after invoking the right to remain silent violated his Sixth Amendment right to the presence of counsel and his Fifth Amendment right to remain silent. Mr. Cash exhausted this argument on his direct appeal. The trial court concluded that Mr. Cash ignored his counsel's advice to remain silent, and that he waived his right to have counsel present. (Doc. No. 7-3 at 18-19, 23-24.) The trial court also concluded that even if Mr. Cash's rights had been violated, he was not prejudiced by introduction of these statements. *See id.*

After reviewing the statements at issue, the Court agrees with Magistrate Judge Hart that "the trial court (and therefore the Superior Court) was clearly correct in finding harmless error." (Doc. No. 59 at 28.) Mr. Cash only identified two pieces of evidence as prejudicial: his statement to police where he identified MCDA as "the Spanish girl," (Doc. No. 37 at 3), and his statement to police that he was the person in a convenience store video that was later played to the jury. *See id.* But as Magistrate Judge Hart points out, Mr. Cash never explains how these statements prejudiced him. He testified at trial that he had traveled from Philadelphia to New Jersey to meet with MCDA, and that he had a consensual liaison with her on the night in question, which is consistent with his knowledge of MCDA's ethnicity, as well as his being at the convenience store in question. Therefore, even assuming that introduction of these statements violated Mr. Cash's constitutional rights, it was not reversible error.

21

## VIII.   Cumulative Error

Lastly, Mr. Cash argues that even if he was not significantly prejudiced by any error in isolation, "he is entitled to relief because of the cumulative prejudicial effect of all of the errors" alleged.  (Doc. No. 54 at 36.)  But as Magistrate Judge Hart correctly noted, the only claim that he has suffered even *de minimis* prejudice for is admission of statements made to police.  Because Mr. Cash's other claims are all either entirely without merit or unambiguously defaulted, he cannot demonstrate cumulative error.

### CONCLUSION

For the foregoing reasons, the Court denies Mr. Cash's Petition for Writ of Habeas Corpus. Magistrate Judge Hart's Report and Recommendation is adopted in full.  Because Mr. Cash has not made "a substantial showing of the denial of a constitutional right," a certificate of appealability will not issue for these claims.  28 U.S.C. § 2253(c)(2).  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

22